**AMOCO OIL COMPANY, Appellee,**

v.

**John A. TORCOMIAN, Albert Torcomian, Appellants.**

No. 83–1053.

United States Court of Appeals, Third Circuit.

Argued Sept. 29, 1983.

Decided Nov. 15, 1983.

As Amended Dec. 6, 1983.

William A. DeStefano (argued), Oliver, DeStefano, Pentima & Partridge, Philadelphia, Pa., for appellee.

John P. Williamson (argued), Hickey, Williamson & Russell, Broomall, Pa., for appellants.

Before ALDISERT, BECKER, Circuit Judges and COHILL,* District Judge.

## OPINION OF THE COURT

BECKER, Circuit Judge.

The question presented by this appeal is whether the district court erred in refusing to afford defendants John Torcomian and Albert Torcomian a jury trial with respect to both the complaint of plaintiff Amoco and the Torcomians' compulsory counterclaim. The basis of the denial was that the claims, which arose out of the parties' dealings concerning an Amoco service station, were equitable in nature. The district court, following a bench trial, found for Amoco on all issues, and the Torcomians appeal. Because we hold that many components of Amoco's main claim and the Torcomians' counterclaim, as pleaded, presented legal issues and sought legal relief, the district court erred in refusing to grant the defendants a jury trial. And because the

district court could not properly have granted Amoco a directed verdict on either its claim or the Torcomians' counterclaim, see EEOC v. Corry Jamestown Corp., 719 F.2d 1219 (3d Cir.1983), the denial of a jury trial was not harmless error. The defendants' seventh amendment rights were therefore violated. Accordingly, the district court's judgment must be vacated and the entire case remanded for further proceedings.

## I. THE RECORD RELEVANT TO THE JURY TRIAL ISSUE

■ The district court's initial determination of whether a jury trial is warranted must be based on the pleadings, including the pre-trial order. For this reason, an appellate court, in deciding whether the district court erred in denying a jury trial, should focus primarily on the pleadings, rather than the testimony as developed at trial. In this case, the district court had the following pleadings before it: Amoco's complaint alleging violations of Pennsylvania state law and the Lanham Act, 15 U.S.C. § 1053 et seq. (1976);[1] the defendants' answer and compulsory counterclaim (which contained a timely jury demand) based upon Amoco's alleged fraud and breach of contract;[2] an answer to the counterclaim; and a 24-page pre-trial order approved by counsel and the court containing, inter alia, a stipulation of uncontested facts; a recitation of disputed facts; an itemization of damages or other relief sought; and a statement of legal issues.

Certain facts were uncontested: (1) Amoco was the primary lessor of a service station known as "Parkside Amoco" in Parkside, Pennsylvania, and had sequentially subleased the property to various dealers; (2) in 1979, the then-current sublessor, Ronald Kashkashian, terminated the sublease by purporting to assign his rights to Vaughn Hoplamazian, who operated Park-

---

* Honorable Maurice B. Cohill, Jr., United States District Judge for the Western District of Pennsylvania, sitting by designation.

1. Jurisdiction was predicated on both diversity of citizenship and the existence of a federal question.

2. Although not explained in the pleadings, jurisdiction over the counterclaim was presumably premised on diversity of citizenship and on principles of ancillary jurisdiction.

side as a tenant at will and who in turn employed John Torcomian as a manager; (3) Albert Torcomian, the father of John, sometimes assisted his son; (4) in June of 1981, Hoplamazian advised Amoco employees that he wished to abandon his interest in Parkside and that John Torcomian wished to be considered as a dealer at Parkside; (5) John Torcomian and his father commenced using Parkside Amoco as an automobile repair shop; (6) Amoco representatives delivered to John Torcomian for his consideration and review an unsigned gasoline delivery contract and related service station franchise contracts; (7) these unsigned contracts were retained by John Torcomian and never signed by anyone; (8) after October 13, 1981, Amoco representatives told the defendants that John Torcomian would no longer be considered as a dealer candidate and insisted that he and his father vacate Parkside Amoco; and (9) defendants refused to vacate.

Other facts and legal conclusions were disputed. According to the pre-trial order and other pleadings, Amoco contended that it never promised to make John Torcomian an official Amoco dealer. Amoco claims that it determined that, because John Torcomian did not intend to comply with Amoco's guidelines for dealers, including attendance at Dealer Development School, and because he had lied to Amoco personnel, he would not be a suitable dealer. Amoco further contended, contrary to the defendants' submissions, that there never was a valid lease between the parties; that there never was a valid franchise agreement, nor could there have been because John Torcomian did not fulfill the requirement of at-tending Dealer Development School, and was also a full-time college student in violation of a standard franchise condition. Amoco also contends that it forebore earlier ejectment proceedings and postponed placement of another dealer at Parkside in reliance upon defendants' assurances that they would vacate before December 31, 1981.

Amoco originally sought extensive relief including: (1) ejectment of the defendants from the service station; (2) a permanent injunction restraining defendants from continued use, enjoyment and possession of Parkside Amoco; (3) a permanent injunction restraining defendants from use of the Amoco logo, tradename, service mark or trademark; (4) judgment in the amount of $46,675 for profits lost as a result of defendants' wrongful possession and fraudulent misrepresentations; (5) judgment for $12,000 for defendants' mesne profits and wrongful use of the Amoco logo, tradename, service mark or trademark; and (6) attorneys' fees. At the beginning of trial, however, Amoco attempted to orally amend its complaint to delete, as we understand it, portions of its complaint that sought money damages other than for mesne profits so as to eliminate any claims that might be construed as legal and to thereby foreclose the defendants' right to a jury trial.[3]

Defendants' pleadings and their submissions in the pre-trial order state a claim that the defendants had a franchise relationship with Amoco at least until July 1984. These claims are based upon negotiations with and representations allegedly made by two Amoco agents, Ralph Arata

---

**3.** Amoco's counsel stated:

Also, Your Honor, to the extent that damages are sought in this case, and possibly to remove any doubt or any ambiguity, the plaintiff will hereby amend any portions of its complaint that seeks monetary damages, other than the equitable remedy of accounting for profits made in one or two manners with respect to the issue of trademark infringement, that is, the fact the defendants have sold products and operated a business on a piece of property upon which the American Oil Company, AMOCO's trademark was present; that an accounting and therefore a disgorgement of any profits or revenues ar-rived therefrom would again be an equitable remedy.

Secondly, in Pennsylvania the remedy of mesne profits, that is, profits derived through unlawful or unconsensual use of another's property is available, and as held by the Supreme Court in the case of American Oil Company versus Burns and others, that remedy is also equitable in nature. Therefore, to resolve the ambiguity my suggestion would be to orally amend the complaint in addition to the predominant equitable nature of these proceedings and a waiver of jury trial pursuant to consent to a combined preliminary injunction hearing and trial on the merits.

and Robert Plocki.[4] In the pleadings, defendants further claim to have had a landlord/tenant relationship with Amoco. While defendants acknowledge that John Torcomian did not attend Dealer Development School, they submit that Arata said that he did not need to in October of 1981. Defendants claim to have been damaged by Amoco's refusal to honor its obligations (such as delivery of gasoline) under the alleged franchise agreement and because of misrepresentations made by Amoco. Specifically, they assert that they made certain payments for advertising, rent, and other items in reliance upon Amoco representations and agreements and that they lost profits as a result of Amoco's failure to honor its statements and agreements. Based on these allegations, the defendants sought "(1) [an] injunction enjoining plaintiff to comply with its franchise agreement with John Torcomian; (2) [a] judgment against plaintiff in an amount in excess of $100,000.00 for profits lost by John Torcomian as a result of plaintiff's failure to comply with its franchise agreement and for plaintiff's fraudulent misrepresentations; [and] (3) [a] judgment against plaintiff in the amount of defendants reasonable attorneys' fee [sic] and other costs involved in defending this action."

In its bench opinion on the merits, rendered after a two-day trial, the district court concluded that defendants were at most tenants at will, and that there had

never been a valid written or oral lease between Amoco and either or both of the defendants that would authorize them to occupy the property. It further concluded that no representative of Amoco having power to do so had ever told John Torcomian he was a dealer, and that John Torcomian, by failing to go to Dealer Development School in October, had failed to fulfill a condition of his becoming an official dealer. The district court expressly resolved all questions of credibility in favor of Amoco and stated that it disbelieved testimony of John and Albert Torcomian that was contrary to that of Arata and Plocki. Accordingly, it ordered the defendants to vacate Parkside Amoco and awarded Amoco $30,000 because it had been prevented from deriving a profit in that amount as a result of defendants' wrongful occupancy of Parkside Amoco.[5]

## II. WERE THE COMPONENTS OF AMOCO'S CLAIM LEGAL OR EQUITABLE?

It has long been settled law that neither joinder of an equitable claim with a legal claim nor joinder of a prayer for equitable relief with a claim for legal relief as to a legal claim can defeat an otherwise valid seventh amendment right to a jury trial. *See Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Dairy Queen, Inc. v. Wood,* 369

---

**4.** The parties also disagree on the spelling of the latter Amoco agent's name. It is spelled in a variety of ways in the record, but it is most often spelled "Plocki."

**5.** The district court's judgment is succinct; it reads:

AND NOW, this 3rd day of January, 1983, upon consideration of the proofs presented at trial of the above-captioned civil action and pursuant to the Court's findings of fact and conclusions of law delivered from the bench on December 30, 1982, it is hereby ORDERED:

1. That judgment in ejectment be entered in favor of plaintiff Amoco Oil Company and against defendants John A. Torcomian and Albert Torcomian.

2. That defendants shall vacate the property located at the northwest corner of Edgemont Avenue and Elbon Road in the Bor-

ough of Parkside, County of Delaware, Commonwealth of Pennsylvania (2901 Edgemont Avenue, Parkside, Pennsylvania), on or before January 16, 1983 at 12 midnight.

3. That judgment be entered in favor of plaintiff Amoco Oil Company and against defendants John A. Torcomian and Albert Torcomian, in the amount of Thirty Thousand Dollars ($30,000.00).

It is not totally clear whether the district court ever formally entered judgment on the counterclaim and whether the appeal is thus properly before us. *See* Fed.R.Civ.P. 54(b), 28 U.S.C. § 1291 (1976). Nonetheless, benefited by a reading of the bench opinion, we construe the order of the district court to have encompassed a judgment adverse to the defendant on his counterclaim. We add that both parties have treated the judgment of the district court as disposing of the counterclaim.

U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). Thus, in order to assess the district court's denial of the defendants' demand for a jury trial as to the main claim, we must consider whether it comprised any legal claims seeking legal relief. If we find such claims, we must vacate the judgment, at least as to those claims, unless we are persuaded that Amoco was entitled to a directed verdict on those claims. *See EEOC v. Corry Jamestown Corp., supra.*

At the outset, we note that on its surface Amoco's complaint appears to present a number of essentially legal claims.[6] The complaint sought ejectment, a form of action long regarded as legal. *See Redfield v. Parks,* 132 U.S. 239, 244, 10 S.Ct. 83, 84, 33 L.Ed. 327 (1889) ("In the courts of the United States where the distinction between actions at law and suits in equity has always been maintained, the action of ejectment is an action at law ...."); *United States v. King,* 44 U.S. (3 How.) 773, 787–88, 11 L.Ed. 824 (1845) (ejectment is legal). It also sought damages, a form of relief usually treated as legal. Plaintiff offers several theories, however, to counter this surface interpretation.

To rebut the normal rule that ejectment is an action at law, plaintiff cites two Pennsylvania cases. *Williams v. Bridy,* 391 Pa. 1, 8, 136 A.2d 832, 836 (1957); and *Fisher v. Knelly,* 68 Sch.L.R. 117, 119 (Schuylkill C.P. 1972). These cases purportedly hold that, where actual title to property is not in doubt, an action for injunction against defendant's continued possession of property leased to plaintiff is equitable. While our preliminary reading of the cited cases suggests that Amoco's interpretation and conclusions are dubious,[7] there is a more telling problem with its argument: Pennsylvania's characterization of ejectment is irrelevant. *See Simler v. Conner,* 372 U.S. 221, 222, 83 S.Ct. 609, 610, 9 L.Ed.2d 691 (1963) (per curiam). As the Supreme Court there held, "[i]n diversity cases, of course, the substantive dimension of the claim asserted finds its source in state law ... but the characterization of that state-created claim as legal or equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law." And federal law, as we have indicated, unequivocally holds actions seeking ejectment to be legal, not equitable.[8]

**6.** Defendants apparently admit that at least some of the plaintiffs' claims (such as equitable relief for trademark infringement and restitution of mesne profits) would not require a jury trial if they stood alone. Nothing we say here is intended to prevent the district court from resolving these components of the complaint without a jury. *Cf. GTE Sylvania v. Continental T.V., Inc.,* 537 F.2d 980, 986 n. 7 (9th Cir. 1976) (suggesting, though, that factual findings implicit in general verdict, made explicit by special verdict, Fed.R.Civ.P. 49(a) or in response to written interrogatories, Fed.R.Civ.P. 49(b), then constrain judge in determination of non-jury claims), *aff'd,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

**7.** One of the cited cases, *Bridy,* quotes an earlier opinion, *Richmond v. Bennett,* 205 Pa. 470, 474, 55 A. 17, 18–19 (1903), for the proposition that:

It is true that in actions respecting real property, where the plaintiff's right has not been established at law, or is not clear, he is generally not entitled to remedy by injunction; but where in a proceeding in equity the plaintiff's title is clear, and all the evidence relating to it is of such a character that a judge in a trial at law would not be at liberty to submit the question of the plaintiff's title to a jury, equity will grant relief although there has been no adjudication of the title at common law. 391 Pa. at 8, 136 A.2d at 836. All that this quote signifies is that equity might grant similar relief as law. But this fact hardly converts a legal remedy into an equitable one. The other case cited by plaintiff, the rather obscure *Knelly* decision of the Schuylkill County Court of Common Pleas, quotes *Bridy* for the proposition that, "where the question of the legal title is incidental and subordinate to other elements which call for the exercise of equitable remedies, equity will take and retain jurisdiction." Even if this quotation supports the proposition that equity in Pennsylvania could grant a superset of the remedies available at law, this proposition would not appear to vitiate the legal character of the ejectment element.

**8.** Our ruling here is in consonance with the old common law rule that "a claimant out of possession who has open to him the remedy of ejectment cannot escape a jury trial of the question of fact on which his claim depends by presenting that issue in some form of equitable action." *Foresman v. Foresman,* 103 Kan. 698, 176 P. 147 (1918).

While apparently conceding that damages for profits lost by dint of the defendants' wrongful occupancy and constitute legal relief, Amoco argues that it abandoned that claim in the oral amendment to its complaint and that the remaining remedy of restitution—which we presume refers to the disgorgement of mesne profits—was equitable. While we do not quibble with this characterization, we regard it too as irrelevant. For while restitution may have been what Amoco wanted, restitution is not what Amoco got. The district court was presented with little evidence on the subject during trial, made no factual findings on the matter,[9] and ordered no accounting. More importantly, the district court explicitly said it was awarding damages because "[a]s a result of defendants' occupancy against the will of the plaintiff, plaintiff has been prevented from deriving a profit from the property in the amount of $30,000." Thus, Amoco apparently never effectively retracted its original demand for legal relief.

### III. WERE THE COMPONENTS OF THE DEFENDANTS' COUNTERCLAIM EQUITABLE OR LEGAL?

■ It is settled law in this Circuit and elsewhere, *see Eldredge v. Gourley,* 505 F.2d 769, 770 (3d Cir.1974) (per curiam); *Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp.,* 294 F.2d 486, 488 (5th Cir.1961), that even an equitable main claim cannot preclude a jury trial on a legal counterclaim, at least when the counterclaim is compulsory.[10] A rule to the contrary would enable the preemptive filing of a complaint by the holder of an equitable claim, coupled with the doctrine of res judicata, to deprive the holder of a legal claim of his seventh amendment right to a jury trial. *See Great Lakes Rubber Corp. v. Herbert Cooper Co.,* 286 F.2d 631, 634 (3d Cir.1961) (failure to assert compulsory counterclaim in earlier action bars assertion in subsequent litigation). Accordingly, we must consider whether there was an element present in the counterclaim which would have given rise to a right to jury trial.[11]

Although the defendants did ask for equitable relief in their counterclaim (i.e., fulfillment of Amoco's obligation under the alleged franchise agreement), defendants also sought damages for the past breach of that agreement. A routine claim such as that presented here for damages stemming from breach of contract is legal. *See Rogers v. Exxon Research & Engineering Co.,* 550 F.2d 834, 838 (3d Cir.1977). As we have noted in Part II of this opinion, the fact that equitable relief is sought in addition to substantial legal relief does not eliminate a right to a jury trial.[12]

### IV. WAS A DIRECTED VERDICT APPROPRIATE?

■ We have now certainly found a sufficient admixture of law in Amoco's main claim and the defendants' counterclaim to render erroneous the district court's denial of a jury trial over at least those elements

---

**9.** Amoco has pointed us to no evidence relevant to a determination of mesne profits. Moreover, our independent examination of the trial record shows the only evidence possibly on point to be a copy of John Torcomian's 1981 federal income tax return, which was introduced as a trial exhibit. The return discloses that he made $8,485 in profits in 1981 from proprietorship of a service station.

**10.** The counterclaim is clearly compulsory here because it arose out of the same transactions and occurrences that were the subject matter of Amoco's claim. *See* Fed.R.Civ.P. 13(a). The whole case revolves around the parties' dealings with each other in 1981 with respect to Parkside Amoco.

**11.** The counterclaim apparently received little attention from the parties during the pre-trial stage and the district court can hardly be faulted for not paying much attention to what the parties did not press upon him. Nonetheless, the defendants never abandoned the counterclaim or their right to a trial by jury thereon.

**12.** Defendants also sought damages for allegedly fraudulent misrepresentations made by Amoco. Whether a counterclaim predicated on fraud is legal or equitable, an issue often requiring intricate analysis, *see General Tire & Rubber Co. v. Watson-Bowman Assoc.,* 74 F.R.D. 139, 141 (D.Del.1977), is not dispositive here. The joinder of an equitable claim with an indisputably legal claim (i.e., the breach of contract claim) cannot preclude a jury trial as to the legal claim. *See supra* Part II. *But cf. infra* note 17 (noting importance of fraud claim given possible applicability of statute of frauds).

of the two claims.[13] The error is harmless, however, if we are convinced that the evidence was such that Amoco would have been entitled to a directed verdict anyway.

■ Unfortunately for Amoco, dispostion of both its claim and the counterclaim—which, as Amoco confesses, was in many ways the "mirror image" of the main claim—rested largely on issues of credibility. Amoco's failure to file a directed verdict motion may attest to this fact. In finding, for example, that no contract existed between Amoco and the defendants that might have authorized their ongoing possession of Parkside Amoco and supported their claim for damages, the district court explicitly discredited testimony that Ralph Arata had said "[y]ou are a dealer until 1984." Indeed, the district court explicitly resolved all critical issues of credibility in favor of Ralph Arata and Robert Plocki and against John and Albert Torcomian.

Viewing the evidence most favorably to the defendants, however, as a trial judge would be obliged to do in considering a motion for a directed verdict, the district court would have had to conclude that a jury could have found a lease or dealership agreement to have existed between Amoco and the defendants. Such agreements might well authorize possession of Parkside Amoco and operation of a business there. John and Albert Torcomian both testified that Ralph Arata had pronounced John Torcomian to be an official Amoco dealer, and both testified that John Torcomian had accepted the terms that had been negotiated by Arata and Plocki at earlier meetings. Consequently, we do not believe that a directed verdict could properly have been granted by the district court in this case on either the claim or counterclaim.[14]

Nor can we say that a directed verdict was warranted for Amoco on grounds that Arata and Plocki had no authority to bind it. For, according to the testimony of John Torcomian, Arata had said that he (Arata) had "the authority to approve me or anybody else as a dealer,"[15] and we cannot say,

---

**13.** Indeed, the admixture of law in Amoco's complaint may be even greater than we have suggested. For we are hardly confident that the action for trademark infringement, for which Amoco sought damages, at least until its purported oral amendment of the complaint, was not one to which seventh amendment protections attach. There is certainly dictum—and perhaps even a holding—in *Dairy Queen* suggesting that damage actions for trademark infringement are legal in character. 369 U.S. at 477, 82 S.Ct. at 899. There is also a square holding to that effect by a district court. *Holiday Inns of America v. Lussi,* 42 F.R.D. 27 (N.D.N.Y.1967).

**14.** We recognize the existence of a controversy over whether, in cases founded solely on diversity of citizenship, a federal or state standard governs the propriety of a directed verdict. *See* C. Wright, *Law of Federal Courts* § 92, at 450 n. 21 (1976). While this debate is an interesting one, its resolution is not dispositive here. The basis of subject-matter jurisdiction over the counterclaim was not exclusively diversity of citizenship; the court also heard the case under principles of ancillary jurisdiction. Moreover, even if the rule for pure diversity cases also covers hybrids such as this, the centrality of credibility issues in a swearing contest such as the current litigation rendered a directed verdict inappropriate by any standard.

**15.** There is, of course, a potential problem of circularity in our reliance on John Torcomian's testimony to demonstrate that a directed verdict against Torcomian would not have been appropriate. John Torcomian's rendition of Mr. Arata's purported pronouncement concerning his authority is probably admissible only under Fed.R.Evid. 801(d)(2)(D) as a statement against a party made "by [its] agent or servant *concerning a matter within the scope of his agency or employment* ...." Yet, it is possible that only the hearsay statements themselves establish that the statements were those of an agent concerning a matter within the scope of his agency (for Amoco). Thus, we may have a fatal bootstrapping of hearsay evidence, one disapproved by the Fifth Circuit in precisely this context in *Perper v. Sonnabend,* 221 F.2d 142, 144 (5th Cir.1955) (agent's authority to bind hotel to brokerage contract cannot be proven by broker's testimony that agent said he had such authority); *City Nat'l Bank v. Basic Food Indus., Inc.,* 520 F.2d 336, 338 (5th Cir.1975) (citing *Perper* rule with approval), and of the type disapproved by this Circuit with respect to the related prohibition on admission of co-conspirator hearsay under Fed.R. Evid. 801(d)(2)(E) without evidence aliunde of the declarant's membership in the conspiracy. *See United States v. Ammar,* 714 F.2d 238, 249–51 (3d Cir.1983).

Nevertheless, several reasons caution against our disregarding this possibly inadmissible hearsay and affirming the judgment of the dis-

**1106**

on the basis of the evidence of the course of dealings between the parties, that a jury could not reasonably have believed that Arata had apparent authority to bind Amoco or that the defendants reasonably relied upon his representations.[16] *See generally* 1 Pennsylvania Law Encyclopedia *Agency* § 95 (1957 & Supp.1983) (discussing Pennsylvania doctrine of apparent authority).[17]

## V. CONCLUSION

We have concluded that both Amoco's main claim and the defendants' counterclaim contained a number of legal components to which the defendants were entitled to a jury trial under the seventh amendment. Accordingly, the judgment of the district court will be vacated and the case remanded for a new trial.

---

trict court on grounds that, even though it erroneously denied a jury trial, a directed verdict would have been warranted. First, as we have suggested, there was non-hearsay evidence arguably bearing on Arata's and Plocki's apparent authority. There was apparently admissible and possibly relevant evidence in the record, for example, about Arata and Plocki coming to see the Torcomians, bringing proposed agreements, perhaps making some representations about furnishing of gasoline, and letting them stay on the property. Second, Amoco did not object to introduction of Torcomian's rendition of the evidence, and we are not confident it was plain error for the district court to have admitted it. Third, Amoco did not argue this point in either its brief or at oral argument. Fourth, we are reluctant to deny the seventh amendment right to a jury trial when we are not confident that there was not a jury triable issue. Fifth, and importantly, if it is indeed true that the defendants cannot produce sufficient evidence aliunde to establish the scope of Arata's and Plocki's agency, Amoco will be able upon remand to argue this point on motion for summary judgment (possibly following an in limine hearing).

**16.** The district court concluded that, because the defendants themselves "testified that Arata talked about pleasing the 'boys upstairs', talked about matters to be handled in the corporate offices, and referred to pleasing the 'big boys,'" that the defendants knew that Arata did not have the power to decide anything. This conclusion does not follow. To begin with, it ignores the testimony of John Torcomian that he thought Arata *did* have authority to bind Amoco. More importantly, it misconstrues Torcomian's testimony, for, according to Torcomian, when Arata talked about the "boys upstairs," it was only with reference to the fact that the "boys upstairs" would be pleased if Torcomian went to Dealer Development School in October rather than January. (Transcript, at 207). There is no other reference to the "boys upstairs" in the record.

**17.** Inasmuch as the defendants may have been claiming an oral lease for more than three years, it is conceivable that plaintiff might have been entitled to a directed verdict on the counterclaim by virtue of the Pennsylvania Statute of Frauds, Pa.Stat.Ann. tit. 68, § 250.201–.202 (Purdon 1965) (limiting enforceability of oral leases for terms longer than three years). Although Amoco apparently did not plead the statute of frauds, it is mentioned in the pre-trial order. In part because of the failure of Amoco to plead the statute of frauds, *see* Fed.R.Civ.P. 8(c), in part because Amoco has not pursued a statute of frauds argument on appeal, and in part because we suspect that even a successful statute of frauds defense to the claim based on contract would not defeat defendants' right to a jury trial on its cognate claim for deceit, *see Buzard v. Houston,* 119 U.S. 347, 353, 7 S.Ct. 249, 252, 30 L.Ed. 451 (1886) (discussing legal character of actions for deceit); *Restatement of Torts* § 530 comment c (1977), we do not find the failure to grant a jury trial harmless on the hypothesis that the statute of frauds might have barred recovery.