# United States Court of Appeals
## For the First Circuit

---

Nos. 04-1406, 04-1461

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellee/Cross-Appellant,

v.

ROBERT D. HAPP,

Defendant, Appellant/Cross-Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, Senior U.S. District Judge]

---

Before

Torruella, Circuit Judge,
Campbell, Senior Circuit Judge,
and Howard, Circuit Judge.

---

Peter M. Casey with whom Stephen C. Warneck, Foley Hoag LLP, Gary C. Crossen and Rubin & Rudman LLP were on brief for appellant, cross-appellee.

Thomas Karr, Special Trial Counsel, Securities and Exchange Commission, with whom Eric Summergrad, Deputy Solicitor, Giovanni P. Prezioso, General Counsel, Melinda Hardy, Assistant General Counsel, and Laura Walker, Senior Counsel, were on brief for appellee, cross-appellant.

---

December 10, 2004

---

**CAMPBELL**, **Senior Circuit Judge**.  The Securities and Exchange Commission (SEC) brought a civil enforcement action in the district court against Robert D. Happ.  After a jury trial, the jury returned a special verdict against Happ, finding that he had traded on material, nonpublic information in violation of the federal securities laws.  Happ appeals from the district court's denial of his motion for judgment as a matter of law, or in the alternative, for a new trial.  Happ also appeals from the monetary remedies imposed by the court -- the sum calculated as the disgorgement amount and an additional civil penalty equivalent to the disgorgement amount.  The SEC cross-appeals from the portion of the district court's judgment imposing sanctions against the SEC for refusing to stipulate until mid-trial that no telephone call to Happ was made from the office of the SEC's main witness on June 25, 1998, or earlier.  We affirm.

## I.  Factual Background

We recite the facts in the light most favorable to the verdict.  See Wennik v. Polygram Group Distribution, Inc., 304 F.3d 123, 126 (1st Cir. 2002).  Happ was a Director, Chairman of the Board of Directors' Audit Committee, and the acknowledged financial expert on the Board of Directors of Galileo Corporation ("Galileo"), formerly a Sturbridge, Massachusetts manufacturer of fiber-optic and electro-optic products.

On April 20, 1998, Happ participated by telephone in a Galileo Board of Directors meeting. At that meeting, William T. Hanley, the chief executive officer of Galileo, provided information to the Board about "two areas of particular concern." One was that shipments had been impacted for the second quarter due to a jurisdictional dispute between the United States Departments of Commerce and State with respect to export of some products. Hanley testified that "[t]he impact was rather small for the second fiscal quarter, but [he] had discussed [with the Board] the fact that if it continued, it could be substantial in the June quarter." Hanley informed the Board that Galileo believed that the export issues "would be resolved in the June quarter, but if they weren't, they would further -- obviously further impact shipments of those products." Hanley also provided the Board with information that Imagyn, a Galileo customer, was past due on $500,000 of the $700,000 it owed Galileo. He indicated that Imagyn "had made some payments in the March quarter," and that Galileo "had assurances from both the CFO of Imagyn and the CEO that [Galileo was] going to be paid." Hanley also noted that Galileo was negotiating an exclusive marketing agreement with a company called Ethicon.

By late June, Galileo was having third quarter financial difficulties. Hanley and Gregory Reidel, Galileo's chief financial officer, met on Thursday, June 25, 1998, two business days before

the end of the third fiscal quarter, to discuss these problems. During that meeting, they decided to seek Happ's advice.

Hanley testified at trial that he left two voicemail messages for Happ, one on Thursday, June 25, 1998, and another on Sunday, June 28, 1998. In the first voicemail message, Hanley told Happ that Galileo was "having some difficulties during the quarter and [he] would like [Happ's] advice on these issues," and he requested a meeting with Happ the following Monday or Tuesday. The second voicemail message was "a duplicate of the previous message," reiterating that Galileo was having "some difficulties" and that Hanley wanted to meet with him Monday or Tuesday. Hanley rarely telephoned Happ or requested a one-on-one meeting with a director in his office. On Monday, June 29, Happ called Hanley's assistant to schedule a meeting with Hanley. Thereafter, on the same day, Happ sold all of his 4,000 shares of Galileo stock, excluding stock options, for approximately $47,000, resulting in a profit of approximately $14,500.

The following morning, Happ met with Hanley and Reidel to discuss Galileo's difficulties, including the company's difficulties in obtaining export licenses, the potential uncollectibility of the Imagyn receivables, and the fact that the Ethicon agreement had not yet been consummated. At the end of the meeting, Happ mentioned to Hanley that he had sold his Galileo

-4-

stock the previous day.  Happ told Hanley that he sold the stock because he needed money from the sale to pay some bills.

On July 15, 1998, Galileo's Board met to discuss the financial results for the third quarter.  On July 23, 1998, Galileo issued a press release publicizing the difficulties from the third quarter and their impact on Galileo's financial performance.  While Galileo had forecast a net profit of $160,000 for the quarter, it reported losses of $3.3 million.  The following day, Galileo's stock price dropped 64% from $8.25 to $3 per share.  Soon thereafter, Happ purchased 5,000 shares of Galileo stock.

## II.  Procedural Background

On October 5, 2000, the SEC filed a complaint against Happ alleging that he traded on material, nonpublic information when he sold 4,000 shares of Galileo stock on June 29, 1998, thereby avoiding losses of $34,758, in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).[1]  After

---

[1]Section 10(b) of the Securities Exchange Act of 1934 provides:

It shall be unlawful for any person, . . . by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . <u>any manipulative or deceptive device or contrivance</u> in contravention of such rules and regulations as the Commission may prescribe . . . .

15 U.S.C. § 78j(b) (emphasis added).  Rule 10b-5 promulgated thereunder states:

> It shall be unlawful for any person . . .
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Rule 10b5-1 provides in pertinent part:

> The 'manipulative and deceptive devices' prohibited by Section 10(b) of the Act (15 U.S.C. 78j) and § 240.10b-5 thereunder include . . . the purchase or sale of a security . . . <u>on the basis of material nonpublic information</u> . . . <u>in breach of a duty of trust or confidence</u> that is owed . . . to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information.

17 C.F.R. § 240.10b5-1 (emphasis added).  Section 17(a) of the Securities Exchange Act of 1933 provides:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

extensive discovery, the case went to a jury trial on September 29, 2003.

The court denied Happ's motions for judgment as a matter of law at the close of the SEC's case and at the close of the evidence.  On October 9, 2003, the jury returned a special verdict against Happ.  After entering final judgment on the verdict, the district court denied Happ's renewed motion for judgment as a matter of law or, in the alternative, for a new trial, as well as Happ's motion for a new trial based on allegedly improper remarks made by the SEC's counsel in its closing argument.  The district court ordered Happ to pay $34,758 as disgorgement for loss avoided, $15,726.63 in prejudgment interest, and an additional $34,758 as a civil penalty.  SEC v. Happ, 295 F. Supp. 2d 189, 200 (D. Mass. 2003).  Happ appeals from the district court's denial of his motions for judgment as a matter of law and for a new trial, and from the portion of the judgment imposing disgorgement and the civil penalty.[2]  As part of its final judgment, the court also imposed sanctions on the SEC in the amount of $87,036 for refusing to stipulate until the middle of the trial that the June 25 call did not take place from Hanley's office to Happ's home.  Id. at 192-94.  The SEC cross-appeals from the sanctions.

---

15 U.S.C. § 77q(a).

[2]Happ does not appeal from the court's award of prejudgment interest, but only argues that it should be recalculated if the disgorgement amount is reduced.

### III. Analysis

### 1. Motion for Judgment as a Matter of Law

We review <u>de novo</u> the denial of a motion for judgment as a matter of law, viewing the evidence and reasonable inferences therefrom in the light most favorable to the jury's verdict. <u>Tapalian</u> v. <u>Tusino</u>, 377 F.3d 1, 5 (1st Cir. 2004). We will reverse the district court "only if the facts and inferences point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have reached a verdict against that party." <u>Santos</u> v. <u>Sunrise Med., Inc.</u>, 351 F.3d 587, 590 (1st Cir. 2003).

### A. Judicial Estoppel

Happ argues that the judgment should be reversed because the district court refused to hold the SEC to its original description of the material, nonpublic information Happ allegedly received prior to selling his stock. Happ says that the SEC initially argued, in successfully opposing his motions to dismiss and for summary judgment, that the material, nonpublic information upon which he had acted was Galileo's serious difficulties <u>adversely affecting its third quarter earnings</u>. At trial, however, the SEC's proof was merely that Happ received information from Hanley that Galileo was having "some difficulties" during the third quarter and that Hanley would like Happ's advice on these issues. Even if these difficulties were of a financial nature, the SEC did

-8-

not show, according to Happ, that they specifically impacted third quarter earnings.

Happ insists that this variance was so fundamental as to call for application of judicial estoppel. This court has stated that "[j]udicial estoppel should be employed when a litigant is 'playing fast and loose with the courts,' and when 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" Patriot Cinemas, Inc. v. Gen. Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987) (quoting Scarano v. Central R. Co. of N.J., 203 F.2d 510, 513 (3d Cir. 1953)). The proponent must show "that the party to be estopped 'succeeded previously with a position directly inconsistent with the one [it] currently espouses.'" Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.), 375 F.3d 51, 60 (1st Cir. 2004) (quoting Lydon v. Boston Sand & Gravel Co., 175 F.3d 6, 13 (1st Cir. 1999)).

Accepting that the SEC successfully urged in pretrial proceedings that Galileo was having serious difficulties affecting its third quarter earnings, the doctrine of judicial estoppel is nonetheless inapposite. The SEC's trial theory was not "directly inconsistent" with its earlier theory. Whatever the distinction between difficulties affecting third quarter earnings and financial difficulties emerging during the third quarter, the distinction falls short of a direct inconsistency. Compare, e.g., Alternative

Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 34 (1st Cir. 2004) (holding that manufacturer was judicially estopped from claiming a breach of an oral contract where it successfully argued on a prior motion that its claim was not a breach of contract theory but rather a claim for failure to negotiate in good faith), and Cadle Co. v. Schlictmann, Conway, Crowley & Hugo, 338 F.3d 19, 22-23 (1st Cir. 2003) (holding that plaintiff was estopped from arguing it was the agent of a note's owner where it had previously argued that it was the owner of the note), with United States v. Shea, 150 F.3d 44, 52 (1st Cir. 1998) (finding that government's assertion at defendant's detention hearing that he possessed an assault weapon was not inconsistent with later representations that a codefendant possessed and used the same assault weapon, given its pursuit of accomplice and principal theories of liability). Happ points to no precedent imposing an estoppel in a comparable situation. We find no legal error in the district court's failure to hold that the SEC was estopped by inconsistency or self-contradiction from pursuing the theory it presented at trial.

The district court also declined to grant judgment as a matter of law for the SEC's failure to prove an element of its complaint, namely, that Happ knew that Galileo's difficulties would adversely affect its third quarter earnings. In dismissing that theory, the court stated in its January 14, 2004 Memorandum and Order, "it is elementary that a variance between allegations and

proofs, in order to be fatal, must be substantial and material."
(quoting Farris v. Meyer Schuman Co., 115 F.2d 577, 579 (7th Cir.
1940)).  It concluded, and we agree, that the variance between the
SEC's complaint and what it proved at trial was not substantial and
material.

The amended complaint alleged that Happ possessed
material, nonpublic information that Galileo was experiencing third
quarter difficulties, which he knew, or was reckless in not
knowing, would adversely impact Galileo's third quarter earnings.
As more fully discussed below, the SEC presented evidence at trial
that Happ was told by Hanley at the end of Galileo's third fiscal
quarter that "we were having some difficulties during the quarter
and [he] would like [Happ's] advice on these issues."  Because Happ
was the chair of the Board's Audit Committee and the financial
expert on the Board, and because he received a telephone call from
Hanley just a few days before the end of the third quarter
requesting an immediate meeting, a rational jury could infer that
Happ was aware those difficulties in the third quarter would likely
(indeed, would almost certainly) relate to financial issues, and
might well impact third quarter earnings.  Hence, what the SEC
proved at trial was not substantially and materially different from
what it alleged in its complaint.[3]

_____

[3]Happ also asserts that the district court erred in denying
his request to instruct the jury that it must decide whether Happ
possessed and used nonpublic information about Galileo's third

-11-

## B. Sufficiency of Evidence

Happ insists that Hanley's voicemail messages to him that Galileo was having "some difficulties during the quarter" did not amount to material, nonpublic information. Merely being told of corporate "difficulties," Happ says, is too generic and too true of all public companies to be material in and of itself. See Ronconi v. Larkin, 253 F.3d 423, 430, 434 (9th Cir. 2001) ("Much of any business consists of having problems and dealing with them. . . . A company could experience 'serious operational problems,' 'substantial difficult[ies],' and 'difficult problems' and still have increasing revenues.").

A fact is deemed material if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (expressly adopting the TSC

---

quarter earnings having been adversely affected by serious difficulties in the quarter. Happ bases this contention on the same flawed judicial estoppel theory rejected above. As explained, judicial estoppel does not apply because the SEC's theory at trial was not directly inconsistent with its earlier theory. Similarly, any variance between the SEC's allegation in its amended complaint and what it proved at trial was not substantial and material. Accordingly, we find no error.

Industries standard for Section 10(b) and Rule 10b-5 violations). The Supreme Court has made clear, however, that the "role of the materiality requirement is not to attribute to investors a child-like simplicity . . . but to filter out essentially useless information that a reasonable investor would not consider significant." Id. at 234 (internal quotation marks and citation omitted). Certain information may be so basic that any investor can be expected to understand its implications. See Levitin v. PaineWebber, Inc., 159 F.3d 698, 702 (2d Cir. 1998) ("certain information is 'so basic that any investor could be expected to know it'") (quoting Zerman v. Ball, 735 F.2d 15, 21 (2d Cir. 1984)).

Here, Happ was a financial expert and had closely followed the affairs of Galileo. The jury could therefore find him capable of drawing reasonable inferences from Hanley's messages. Cf. Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1028-29 (4th Cir. 1997) ("A sophisticated investor requires less information to call a '[mis-]representation into question' than would an unsophisticated investor. . . . Likewise, when material information is omitted, a sophisticated investor is more likely to 'know[ ] enough so that the . . . omission still leaves him cognizant of the risk.'") (citation omitted).

Happ had participated in an earlier nonpublic meeting of the Galileo Board of Directors on April 20, 1998. During that

meeting, Hanley told the Board of two areas of potential financial concern:  the Departments of State and Commerce were holding up the shipping of certain of Galileo's products, a policy that Hanley indicated could, unless resolved, have a substantial impact on the June quarter; and Galileo's largest endoscope customer, Imagyn, was past due on $500,000 of the $700,000 it owed Galileo.  Hanley testified to calling Happ two months later and leaving voicemail messages on June 25 and 28 that Galileo was experiencing third quarter difficulties, that he desired Happ's advice on these issues, and that he wanted to meet with Happ in his office the following Monday or Tuesday.  There was evidence that a call from Hanley to Happ and an in-person meeting between Hanley and Happ in Hanley's office were unusual occurrences.

Happ argues in response that the only negative information about Galileo he was shown to have possessed at the time he sold his stock were Hanley's vague statements of "difficulties" in his voicemail messages seeking to arrange a meeting.  All other information he then possessed concerning Galileo's financial health was positive, he says.  The positive information included the other matters discussed at the April 1998 Board meeting and the contents of a May 1998 Boston Business Journal ("BBJ") article about Galileo.  Hanley had devoted most of the two-hour April Board meeting to discussing positive developments and expectations; he spent less than ten minutes

-14-

discussing the unfavorable export restrictions and Imagyn matters. The article in the BBJ was not entirely favorable: it mentioned the loss of the Xerox business a year and a half before, a "major blow to the company," that had precipitated losses during six consecutive fiscal quarters. But as Hanley testified, the article as a whole "paint[ed] a very positive picture of the current status [of Galileo] in May of 1998." Based on this information, Happ urges that, in late June 1998, he believed Galileo was performing well, and that his sale of stock on June 29 could not reasonably be found to have been triggered by the vague information in the voicemail messages.

In the circumstances, however, we believe a rational jury could find that the information that Galileo was experiencing "difficulties," communicated by Hanley to Happ in voicemail messages near the end of the third quarter, constituted material, nonpublic information triggering his stock sale. Happ knew from the April 1998 Board meeting that Galileo potentially faced certain financial problems in the third quarter. He also knew that a telephone call from Hanley was unusual, and that a meeting between him and Hanley at Hanley's office was likewise uncommon. Happ was chair of the Board's Audit Committee; he was regarded as the Board's financial expert. In this context, Hanley's statement that Galileo was experiencing "difficulties" in the quarter, his expressed desire for Happ's advice, and his summonsing of Happ to

-15-

a meeting, could be found to imply that the difficulties were financial in nature and, quite possibly, urgent. Why else would Hanley wish to schedule, on short-notice, the unusual meeting with Happ? As Happ would know, the third quarter would close within a few days. Hence, we believe a reasonable jury could find that Happ inferred from the voicemail messages that Galileo faced significant financial problems affecting its third quarter, and that this information altered significantly the "total mix" of information available to a reasonable investor in his posture. See Basic, 485 U.S. at 231-32.[4]

Happ argues that his subjective inferences from the bits and pieces of information he received would not equate to knowing possession of material, nonpublic information. In support of this argument, Happ cites SEC v. Sargent, 229 F.3d 68 (1st Cir. 2000). There, the SEC charged Sargent with insider trading for purchasing and selling stock of Purolator while in possession of an alleged tip from defendant Shepard, regarding Purolator's pending

---

[4]According to Happ, the information that Galileo was facing "some difficulties," communicated by Hanley to Happ, is immaterial as a matter of law, and does not become material simply because one insider (Hanley) communicated it to another (Happ). "A fact does not become more material to the shareholder's decision because it is withheld by an insider, or because the insider might profit by withholding it." Pavlidis v. New England Patriots Football Club, Inc., 737 F.2d 1227, 1231 (1st Cir. 1984). But in the circumstances here, as explained above, there is a substantial likelihood that a reasonable investor would consider the fact that Galileo was experiencing difficulties near the end of the third quarter significant.

-16-

acquisition by another company.  Id. at 72-73.  Sargent asserted that "he had acted on a hunch based on two pieces of information he had learned" at a dinner with Shepard, namely the statements by Shepard (1) that his partner Aldrich was on the Board of Purolator, and (2) that he knew of a company that was going to be acquired, but in which he could not invest because he was too close to the situation.  Id. at 73.  On appeal, we stated:

> [T]here could be no violation . . . if Sargent traded on a mere hunch arrived at by putting together the fact that Aldrich was on the Purolator Board, which was public information, with the statement made by Shepard that he knew of a company being pursued.  To prevail on its claims, the Commission must show that Shepard communicated nonpublic information about Purolator to Sargent.

Id. at 74 (alteration omitted).  Happ argues that the SEC's theory here is no better than the type of "hunch" that we rejected in Sargent.  Happ neglects to indicate, however, that the Sargent court concluded that "a jury could reasonably infer from [the] evidence that Sargent was operating on more than just a hunch and that he had received nonpublic information from Shepard about Purolator."  Id. at 75 (emphasis added).  On that basis, we reversed the entry of a directed verdict for the defendants.  Id. Similarly, here, after resolving all doubts and credibility issues in favor of the verdict, we find that a jury could reasonably infer from Hanley's testimony that Happ operated on "more than just a hunch," and had received material, nonpublic information just before he sold his stock.

-17-

Happ suggests that there is insufficient evidence for the jury to have found that Hanley actually called him and left him one or more voicemail messages requesting a meeting the following Monday or Tuesday to discuss the "difficulties" Galileo was experiencing during its third fiscal quarter. The first such call Hanley testified to was on June 25, 1998. Hanley said that his "best memory" was that he telephoned Happ from his office that day, requesting such a meeting about those difficulties. He said he remembered the call because he met with Reidel the same day and because his office desk ledger for that date shows that he wrote down Happ's phone number. According to Hanley, it was his usual practice to write down a phone number and then call the number.

Hanley's testimony to a June 25 call from his office to Happ was seriously contradicted, however, by AT&T's billing records. These failed to show the making of any such call. The SEC ultimately stipulated with Happ as follows:

> [T]he AT&T billing records for Galileo Corporation for June 1998, do not reflect a call from Galileo to Mr. Happ's home on June 25, 1998, or, for that matter on June 22, 23, or 24. <u>The call did not take place from Mr. Hanley's office on the 25th of June or on the 22nd, the 23rd, or the 24th</u>. (emphasis added).

Having been stipulated, the emphasized language denying any call on the 25th or earlier dates from Hanley's office was binding. <u>See</u> <u>PPX Enters., Inc.</u> v. <u>Audiofidelity, Inc.</u>, 746 F.2d 120, 123 (2d Cir. 1984) ("Under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court.");

-18-

Jackson v. United States, 330 F.2d 679, 681 (8th Cir. 1964) ("It is a well-settled general rule of law that facts which are stipulated during the course of a trial are to be taken by the jury as conclusively proven."). Notwithstanding so, the district court expressed the opinion that the jury could rationally have credited Hanley's testimony to the limited extent of finding that Hanley made the purported call on June 25 but from some other location. Hanley testified that, in June of 1998, he had a phone in his car that he sometimes used when he was in the car and needed to return messages or make phone calls, although he never said he made the call in question from that phone.

While the stipulation and telephone records left Hanley's testimony of a June 25 call in some doubt, there was solid evidence of a second, identical call prior to Happ's sale of the stock. Hanley testified that, on June 28, he called Happ again, this time from his home, and again left a voicemail message. Hanley's telephone records reflected such a call on that date. According to Hanley, this voicemail was a "duplicate" of the June 25 voicemail. Hanley testified he again mentioned that Galileo was experiencing "some difficulties." Happ himself acknowledged a telephone message from Hanley requesting a meeting, although he testified that Hanley said nothing about difficulties or troubles. Hence, even omitting the earlier call on June 25, there was sufficient evidence of at least one call having been made prior to the time Happ sold his

-19-

stock during which, if the jury credited Hanley, a voicemail message alluding to Galileo's "difficulties" was left for Happ.[5]

Additionally, Happ's own testimony can be said to lend some support to the jury's conclusion that he possessed and used material, nonpublic information. According to Happ, he himself initiated contact with Hanley on June 26, 1998 "to get an update on what was going on within the company," because he was thinking about selling his stock. Happ said that he called to see if there were any negative developments at Galileo that might lead someone later to say that he had inside information when he sold his stock. Hanley told him there were developments at Galileo, but Happ admitted he never asked Hanley about the nature of the developments or whether they were positive or negative. Happ said he assumed from Hanley's upbeat tone that they were positive. The jury could have reasonably concluded, however, that Happ would have held onto his stock if he had interpreted Hanley as saying the company was doing well. The jury could also have reasonably inferred that he sold his stock, just after hearing from Hanley and just one day

---

[5]Happ asserts that Hanley's trial testimony that he mentioned "difficulties" in his June 28 voicemail was brand new. Hanley admitted on cross examination that he had previously testified at the SEC in October 1999 that he "didn't know" if he said anything about "difficulties" in the June 28 voicemail message. Similarly, Hanley conceded that he had testified in his deposition in August 2002 that all he could recall was that the June 28 voicemail was in the nature of setting up an appointment and nothing more. But Hanley consistently testified at trial that his "best memory" was that he used the word "difficulties" in both voicemail messages. We find that a reasonable jury could have credited this testimony.

before their meeting to discuss difficulties at Galileo, in an attempt to avoid being charged later with insider trading. Although "[s]uspicious trading by itself cannot suffice to warrant an inference that [a trader] . . . traded on the basis of material non-public information," SEC v. Truong, 98 F. Supp. 2d 1086, 1097 (N.D. Cal. 2000), there is sufficient evidence in addition to the timing of the sale for the jury to have found that Happ possessed and used material, nonpublic information in deciding to sell when he did.

## 2. Motion for New Trial

The denial of a motion for a new trial is reviewed for abuse of discretion. Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 375 (1st Cir. 2004). Generally speaking, "motions for a new trial are directed to the trial court's discretion and th[e] remedy is sparingly used." Dall v. Coffin, 970 F.2d 964, 969 (1st Cir. 1992) (quoting United States v. Rivera-Sola, 713 F.2d 866, 874 (1st Cir. 1983)).

Happ argues that the district court abused its discretion in denying his motion for new trial, relying broadly upon three grounds: (1) the SEC counsel's misstatements in closing argument; (2) allegedly erroneous evidentiary rulings by the court; and, (3) alleged errors relating to the jury instructions. We address these matters in turn.

## A. SEC Counsel's Misstatement of Law in Closing Argument

First, Happ asserts that he is entitled to a new trial because counsel for the SEC misstated the law during the SEC's closing argument. Happ testified at trial that, inter alia, he sold his shares of Galileo stock on June 29, 1998 because he had a profit in the stock. He testified he did not sell his Galileo stock earlier because the securities laws prohibited the sale of stock by an insider until six months after the insider's most recent purchase, and he had purchased some of his shares on December 22, 1997. The parties agree that the "short-swing profit rule," Section 16(b) of the Securities Exchange Act, 15 U.S.C. § 78p(b), forbids an insider of a company to sell any shares of that company for profit within six months of the most recent purchase of any shares, regardless of whether the shares sold are the same shares as those purchased.[6] Because Happ's most recent purchase of Galileo stock occurred on December 22, 1997, the restrictions of the "short-swing profit rule" would have expired on June 22, 1998.

---

[6]Section 16(b) of the Securities Exchange Act provides:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . involving any such equity security within any period of less than six months, . . . shall inure to and be recoverable by the issuer . . . .

15 U.S.C. § 78p(b).

In closing argument, counsel for the SEC attacked Happ's testimony as to why he sold his stock when he did:

> Now, why did he say he sold his stock? He claims he sold his stock simply because he saw a profit in the stock, as if it were simply a coincidence that he saw a profit exactly at the same time that he was receiving these calls from Mr. Hanley. If he had truly wanted a profit in the stock, he could have sold at even higher profit if he had sold in March, April, May, or anytime earlier than June of that year.
>
> . . .
>
> He now claims the reason that he didn't sell his stock earlier was because of the six-month short-swing profit rule. However, this is a new story. This is something that he didn't tell Sandra Bailey of the SEC when she called on the telephone. And, indeed, he admitted that with respect to half the shares, that at the expiration of that six-month period in mid-December, the six-month period was up and he was permitted to sell those shares.

While Happ made no immediate objection to the SEC's argument, he later asked the court, following argument and before the jury began deliberations, for a curative instruction, citing the "short-swing profit rule" and counsel's misstatement of law. The court denied the request. Happ renewed his request after the jury submitted a question about the second to last question on the special verdict form concerning scienter. The court again denied the request. The next morning, Happ requested a curative instruction for the third time, submitting a supporting memorandum. That same morning, the jury posed a question about the last question on the special verdict form concerning the interstate commerce element.

After further argument, the district court at last gave the jury the precise curative instruction that Happ had earlier requested in writing. That instruction was as follows:

> During closing arguments, in reference to Mr. Happ, counsel for the SEC made the following statement: "If he had truly wanted a profit in the stock, he could have sold at even higher profit if he had sold in March, April, May, or anytime earlier than June of that year." I am instructing you to disregard that statement in its entirety. Under federal law, Mr. Happ was not permitted to sell Galileo stock for a "profit" for a period of six months after his most recent purchase of Galileo stock.

Approximately fifteen minutes after receiving the curative instruction and the answer to the final question on the special verdict form, the jury returned its special verdict in favor of the SEC. Happ moved for a mistrial, and the district judge denied the motion. Happ, 295 F. Supp. 2d at 195. On appeal, Happ claims that the curative instruction came too late to undo the prejudice of the SEC's misstatement because it apparently came after the jury had already decided the questions of credibility and liability against Happ.

Absent an abuse of discretion, this Court defers to a district court's denial of a motion for a new trial based upon improper argument or conduct of counsel. P.R. Aqueduct & Sewer Auth. v. Constructora Lluch, Inc., 169 F.3d 68, 81-82 (1st Cir. 1999). "In assessing the effect of improper conduct by counsel, the Court must examine the totality of the circumstances, including the nature of the comments, their frequency, their possible

relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself." Id. at 82.[7] This Court will only reverse upon a showing of prejudice. Santos, 351 F.3d at 593.

The misstatement by the SEC's counsel was real and serious. Counsel misleadingly proposed to the jury that Happ might have sold his securities for a profit at a time when the law, in fact, disallowed such a sale. A representative of the SEC, the agency charged with enforcement of the securities laws, is expected to know those laws and to refrain from either inadvertent or intentional misstatements regarding them. The court, however, rendered a curative instruction, albeit late in the day. Moreover, Happ's counsel could have pointed out the error to the jury in the course of his own later closing argument, which he did not do. Overall, we are not persuaded that Happ was prejudiced by SEC counsel's closing remarks, ill-advised though they were.

Happ argues that the misstatement was especially heinous in light of the record before trial. At oral argument on Happ's motion for summary judgment, the SEC had asserted that Happ could

---

[7]As did the district court, the SEC relies on the standard we have applied in criminal cases to determine whether misstatements made in closing argument warrant a new trial. See United States v. Palmer, 203 F.3d 55, 58 (1st Cir. 2000) (listing three factors); United States v. Auch, 187 F.3d 125, 129 (1st Cir. 1999) (same). In civil cases, we have employed the "totality of the circumstances" standard, which we also apply here. P.R. Aqueduct & Sewer Auth., 169 F.3d at 82.

have sold the shares he bought in June 1997 at any time six months thereafter. Happ informed the court in his trial brief, served on counsel in advance of trial, that this assertion was based on an error of law, because he was prohibited, under the "short-swing profit rule," from selling any Galileo stock for six months after his purchase in December of 1997. The SEC does not now disagree with Happ's reading of the rule, but instead argues that counsel's remarks were inadvertent and not intended to mislead the jury about the law, but rather simply to describe Happ's own understanding of the situation when he sold his shares.

We find little to commend in the SEC's excuses for its misconduct. Even if the remarks were intentional, however, the district court's curative instruction cures any error. The district court gave the instruction Happ requested. To be sure, Happ contends that he was prejudiced by the late timing of the instruction. The curative instruction was given after the jury began its deliberations and only in response to Happ's third request. The district court itself stated that the lateness of its response "create[d] special problems." Nevertheless, the instruction received special emphasis because it was in writing and was separate from the other jury instructions. We are not disposed to conclude that a jury will not follow a curative instruction. See Refuse & Envtl. Sys., Inc. v. Indus. Servs. of Am., Inc., 932 F.2d 37, 40 (1st Cir. 1991) ("A basic premise of our jury system is

that the jury follows the court's instructions."). Happ contends that the fact the jury returned its verdict against Happ only fifteen minutes after receiving the curative instruction indicates the jury's mind was already made up. But a more likely explanation is that the jury simply thought the SEC's misstatement was not a material factor in reaching its verdict.

Moreover, whether Happ could permissibly have sold his stock earlier is a relatively small point in the overall case. The jury had before it a vast reservoir of evidence including Happ's testimony concerning his reasons to sell when he did. Aspects of Happ's own testimony might well have seemed inconsistent and implausible to the jury. Given the weight of the evidence, the district court could reasonably determine that the SEC's erroneously premised argument would not likely have affected the outcome of the trial. Accordingly, we think it was within the court's discretion to deny the motion for a new trial on this ground.[8]

---

[8]Happ also argues that the SEC, in its closing argument, misrepresented the nature of the evidence adduced at trial by stating that Happ's reliance on the short-swing profit rule was a "new fabrication," which arose after his initial interview with the SEC. Because Happ failed to timely object on this basis before the jury began deliberating, the SEC asserts that Happ's argument is waived. But as we have stated, "when no timely objection is made, claims of improper closing argument are forfeited, not waived, and thus amenable to review for plain error." Smith v. Kmart Corp., 177 F.3d 19, 25 (1st Cir. 1999). Sandra Bailey, the SEC investigator, testified that, during the initial interview, the only reason Happ provided for selling his stock when he did was that the "price had gone up." In response to a question from SEC's

**B.  Allegedly Erroneous Evidentiary Rulings and Jury Instructions**

As a second basis for a new trial, Happ asserts alleged evidentiary errors.  Evidentiary rulings are reviewed for abuse of discretion.  United States v. Marino, 277 F.3d 11, 24 (1st Cir. 2002), cert. denied, 536 U.S. 948 (2002).

As a third basis, Happ contends he is entitled to a new trial because of errors in the court's jury instructions.  We review jury instructions de novo.  Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co., 295 F.3d 68, 76 (1st Cir. 2002).  We reverse the giving of an instruction "if it (1) was misleading, unduly complicating, or incorrect as a matter of law, and (2) adversely affected the objecting party's substantial rights."  Sheek v. Asia Badger, Inc., 235 F.3d 687, 697 (1st Cir. 2000).

i.  Admission of Evidence of Galileo's Insider Trading Policies

Happ argues the district court erred in admitting evidence of Galileo's insider trading policies and in instructing the jury that it must decide whether Galileo had such a policy.  He

---

counsel concerning any other reasons Happ provided for selling the stock, Bailey responded that Happ provided no further reasons.  A jury could have rationally concluded from Bailey's response that Happ did not mention the short-swing profit rule during the interview as a reason for not selling his stock in June.  Even if Happ could show some degree of prejudice resulting from SEC counsel's argument, Happ cannot demonstrate, as he must, that the error "resulted in a miscarriage of justice or seriously affected the fairness, integrity or public reputation of the judicial proceedings."  Id. at 26 (quoting Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 189 (1st Cir. 1996)).

argues that such evidence is irrelevant, and, even if it were relevant, that there was no evidence Happ knew about the policy.

No error in the admission of evidence is ground for granting a new trial "unless refusal to take such action appears to the court inconsistent with substantial justice." Fed. R. Civ. P. 61. Ordinarily, "the admission of evidence is not prejudicial if the facts have already been shown by admissible evidence, but it would be inconsistent with substantial justice if the evidence is insufficient to support the verdict without the erroneously admitted evidence." deMars v. Equitable Life Assurance Soc'y of United States, 610 F.2d 55, 62 (1st Cir. 1979).

Here, the evidence of Galileo's insider trading policy was arguably relevant to establish that Happ had a duty of trust or confidence, which he violated, to refrain from using material, nonpublic information. See supra note 1 (quoting 17 C.F.R. § 240.10b-5); Dirks v. SEC, 463 U.S. 646, 654-55 (1983); Chiarella v. United States, 445 U.S. 222, 228-29 (1980). In this case, the further evidence was of questionable necessity, as the parties stipulated that Happ was a Galileo director, and the court instructed the jury that a director of a corporation has a fiduciary duty to the corporation and its shareholders. See id. Happ testified that he knew of his fiduciary duty not to engage in trades of Galileo stock while in possession of nonpublic information. Given that Happ's duty to Galileo's shareholders was

-29-

well-established by the above, the court might possibly have excluded as cumulative the evidence of Galileo's own insider trading policies. However, we need not and do not decide whether the court's decision to admit this evidence was error. At the very worst, assuming error, the error was harmless. See deMars, 610 F.2d at 62 (admission of cumulative evidence was harmless error).[9] By the same token, we see no adverse effect on Happ's substantial rights in the court's instruction to the jury that it should find whether Galileo had such a policy. See Sheek, 235 F.3d at 697.

ii. Admission of Evidence of Correspondence With CAI Wireless

Happ also challenges the admission of two letters he wrote to counsel for CAI Wireless, a company for which he had been a director in early 1997. The letters related to Happ's improper

_____

[9]Even if the evidence were relevant, Happ argues he did not receive or know about Galileo's insider trading policy before he sold his stock in June 1998. The district judge excluded Galileo's policy statement published in the early 1990s or late 1980s (Trial Ex. 41) and an October 1994 memorandum to the Board of Directors reflecting Galileo's general trading policies (Trial Ex. 44), because there was no evidence Happ, who became a Galileo Director in 1995, received or knew about those particular documents. The SEC, however, presented evidence from which a jury could reasonably conclude Happ knew about Galileo's insider trading policy when he sold his stock. Josef Rokus, Galileo's Vice President of Corporate Development, testified that he sent a copy of a March 1996 memorandum about Galileo's insider trading policy to directors, including Happ, in September 1998. While Rokus did not recall specifically distributing the March 1996 memorandum to the directors in 1996, he testified that "[o]bviously, [his September 1998] cover memo indicates that it was, so [he] would say that it probably was." The jury could have found it was more likely than not that Happ knew of the policy when he sold his stock on June 29, 1998.

purchase of CAI Wireless stock during a period that he believed an approved trading window was open. As a result of Happ's purchase of CAI Wireless stock, he was asked to sell the stock, causing him to violate the "short-swing profit rule" and to disgorge his profits to the company. Happ testified that he wrote to counsel for CAI Wireless in both letters that he would in the future confirm in advance with the company that a trading window was open before purchasing its stock. Happ argues that the letters were irrelevant and constituted impermissible impeachment evidence under Fed. R. Evid. 608(b),[10] designed to show that, because Happ knew that CAI Wireless had an insider trading policy when he was a CAI Wireless director, he should have known that Galileo did. But the SEC responds that this evidence was admissible under Fed. R. Evid. 404(b)[11] to show Happ's state of mind when he sold his Galileo stock. We agree.

This Circuit applies a two-part test to determine whether evidence of extrinsic acts is admissible. <u>United States</u> v.

---

[10]Rule 608(b) of the Federal Rules of Evidence states that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, . . . may not be proved by extrinsic evidence." Fed. R. Evid. 608(b) (2003).

[11]Rule 404(b) of the Federal Rules of Evidence states in pertinent part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." Fed. R. Evid. 404(b) (2003).

Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996). First, the evidence must be probative of an issue in the case, such as intent or knowledge, without including bad character or propensity in the inferential chain. Id.; Fed. R. Evid. 404(b). Second, its probative value must not be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; see Frankhauser, 80 F.3d at 648-49.

Here, evidence of the correspondence from Happ to counsel for CAI Wireless was probative of Happ's state of mind when he sold his Galileo stock. The government had the burden to prove that Happ had the requisite scienter, which the Supreme Court has defined as "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). Happ testified at trial that his purchase and sale of CAI Wireless stock made him more aware of insider trading policies. He also testified that he first learned of the "short-swing profit rule" during the incident with CAI Wireless, and that this incident was on his mind when he contemplated selling his Galileo stock. Due to the similarity of the violations alleged here and in the CAI Wireless episode, we think the letters were admissible to show Happ's understanding of what he could do under the securities laws and why he sold his Galileo stock when he did. Moreover, given Happ's awareness of insider trading policies and his expressed intent to seek prior clearance of future CAI Wireless trades, his

failure to clear his sale of Galileo stock in advance and his failure to inquire as to Galileo's insider trading policies were probative of his intent. We also think the court could reasonably determine that the probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. See Fed. R. Evid. 403.

iii. Instruction Concerning the Federal Securities Laws and the SEC

Happ argues that the district court erred in instructing the jury about the purposes of the federal securities laws and the SEC's role in enforcing them. He claims that the instruction invited the jury to find him liable without considering the elements of an insider trading claim, and that the instruction prejudiced him by presenting the SEC "in a very positive light." We find no error. Although the district court gave the jury background on the SEC and the statutes it enforces, it also gave detailed instructions concerning each element of an insider trading claim and instructed the jury not to favor the SEC by virtue of its role as a government agency. We have no reason to believe that the jury did not follow these instructions. See Indus. Servs. of Am., 932 F.2d at 40. Accordingly, we find no error in the given instructions.

iv. Instruction on Scienter

Happ also contends that the district court improperly injected a negligence standard into its instruction on the scienter

element. The court instructed the jury that an element of the Section 10(b) claim was that "the defendant engaged in an act, practice, or course of business that operated, or, by an ordinarily prudent person in his position at the time he acted, would be expected to operate as a fraud or deceit upon some person." This appears to be an attempt to restate one type of act which Rule 10b-5 makes unlawful. See 17 C.F.R. § 240.10b-5 ("It shall be unlawful for any person . . . (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."). Although this instruction, standing alone, could be said to inject an incorrect negligence standard, the district court plainly instructed the jury that it must find intentional or knowing conduct in order to find the requisite scienter. The jury's special finding that Happ acted with intent and with knowledge further demonstrates that there was no prejudice.

### 3. Monetary Awards Against the Defendant

### A. Disgorgement Amount

Happ challenges the district court's so-called disgorgement order. He argues that the sum awarded was inappropriately based on the "loss avoided," i.e., the difference between the value of his Galileo stock when sold on June 29, 1998 ($46,758), and the value of the same number of shares on July 24, 1998, the day after Galileo's July 23 press release ($12,000).

Happ contends that the most he should be required to disgorge, if anything, is the profit on the sale of his Galileo stock, i.e., the difference between his proceeds on June 29, 1998 and his cost basis for the shares ($14,508.42).

The district court's disgorgement order is reviewed for abuse of discretion. SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1475 (2d Cir. 1996). In an insider trading case, the proper amount of disgorgement is generally the difference between the value of the shares when the insider sold them while in possession of the material, nonpublic information, and their market value "a reasonable time after public dissemination of the inside information." SEC v. MacDonald, 699 F.2d 47, 54-55 (1st Cir. 1983); see also SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995); SEC v. Shapiro, 494 F.2d 1301, 1309 (2d Cir. 1974). The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation." SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989). The risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty. Id. at 1232; Patel, 61 F.3d at 140; see also MacDonald, 699 F.2d at 55 ("doubts are to be resolved against the defrauding party"). Once the SEC shows that the disgorgement is a reasonable approximation, the burden shifts to the defendant to demonstrate that the amount

of disgorgement is not a reasonable approximation. First City Fin., 890 F.2d at 1232.

Happ contends that the amount of disgorgement ordered was not causally connected to the violation because he did not know the information contained in the July 23 press release when he sold his stock on June 29. The SEC argues that the fact that Happ did not possess the exact information in the July 23 statement does not detract from the fact that he received information that Galileo was having difficulties in the third quarter.

The disgorgement order in the amount of the "loss avoided" was not an abuse of the district court's discretion. Although the SEC bears the ultimate burden of persuasion that a disgorgement figure is a reasonable approximation of the amount of unjust enrichment, id., the SEC's showing of the stock price drop after Galileo publicly disclosed its third quarter difficulties on July 23 presumptively satisfied that burden. The stock price drop occurred after the release of the July press release, which informed the public both that Galileo had experienced difficulties during the third quarter and indicated the nature of some of those difficulties. Among other things, the press release contained information about the Imagyn receivable, the unsuccessful attempt to negotiate a marketing relationship with Ethicon, decreased orders, continued difficulty in obtaining export licenses due to the jurisdictional dispute, a reorganization and a reduction in

force that would lead to substantial fourth quarter charges, and a violation of Galileo's bank loan covenants. The loss in Galileo's profits was causally connected to those difficulties. Although the information Happ had earlier received did not disclose the actual nature of Galileo's difficulties, Happ's impropriety nonetheless consisted of selling his shares upon learning of the as yet unspecified difficulties. It is not unreasonable to hold Happ accountable for the drop in value attributable to those same difficulties when fully revealed.

Once the burden shifted to Happ, he failed to show that the amount of "loss avoided" was not a reasonable approximation. Happ failed to demonstrate, for example, any "clear break in or considerable attenuation of the causal connection between the illegality and the ultimate profits." Id. Happ offers an alternative calculation, based on his actual profits, but offers no causal link between his cost basis and the losses he avoided through insider trading. As the wrongdoer, Happ must bear the risk of uncertainty in calculating the amount of disgorgement. See id.; Patel, 61 F.3d at 140. We find no error.

## B. Additional Civil Penalty

The Insider Trading and Securities Fraud Enforcement Act ("ITSFEA") authorizes courts to impose a penalty of up to "three times the profit gained or loss avoided" as a result of the insider trading. 15 U.S.C. § 78u-1(a)(2). ITSFEA civil penalties were

enacted to "enhance deterrence against insider trading, and where deterrence fails, to augment the current methods of detection and punishment of this behavior." H.R. Rep. No. 100-910, at 7 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 6044. We review an order imposing a civil penalty for abuse of discretion. SEC v. Sargent, 329 F.3d 34, 38 (1st Cir. 2003). A court may consider several factors in evaluating whether or not to assess civil penalties, such as:

> (1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the defendant's financial worth; (4) whether the defendant concealed his trading; (5) what other penalties arise as the result of the defendant's conduct; and (6) whether the defendant is employed in the securities industry.

Id. at 42. The district court found that factors 1, 2, 4, and 6 favor Happ while factors 3 and 5 favor the imposition of a civil penalty. Happ, 295 F. Supp. 2d at 200. The court found the factors "decidedly mixed" and exercised its discretion to impose a penalty equal to the loss avoided, or $34,758, in order to effectuate the Congressional intent to punish those who violate securities law. Id. Happ does not appear to challenge the court's findings as he raises no arguments concerning factors 3 and 5. Instead, he simply argues that a penalty was not appropriate here. We are satisfied that the court acted within its discretion to impose a civil penalty on Happ, not only to punish him but to serve as a deterrent on insider trading generally.

## 4.   Sanctions Against the SEC

During discovery, Happ served requests for admission, which asked the SEC, inter alia, to admit that "Hanley did not make a telephone call from Galileo's offices in Sturbridge, Massachusetts to Happ's residence in Weston, Massachusetts, telephone number 781-899-8081, on June 25, 1998."  On November 7, 2002, the SEC denied the request based on Hanley's testimony that he made the call from his office.  Happ claimed that Galileo's AT&T billing records, which did not show a call on June 25, 1998 to Happ, established that no call was made from Hanley's office to Happ that day.  In order to prove that the call did not take place from Hanley's office, Happ deposed AT&T, deposed Bell Atlantic (Galileo's other telephone service provider during June 1998), deposed Galileo's facilities manager who was responsible for tracking telephone bills, and retained an expert concerning business telephone systems and telephone service provider facilities and records.  On September 11, 2003, three weeks before trial, the parties stipulated to the authenticity and accuracy of the phone records, but not to their completeness.  It was not until Happ was about to call the first of two witnesses, including one expert witness, to establish that the telephone records were complete, that the SEC agreed to stipulate that the telephone records did not reflect a call from Galileo to Happ on June 25,

1998 and that "[t]he call did not take place from Mr. Hanley's office on the 25th of June or on the 22nd, the 23rd, or the 24th."

In its judgment, the district court imposed sanctions on the SEC in the amount of $87,036 for its refusal to stipulate until mid-trial that the June 25 call did not take place from Hanley's office to Happ's home. Happ, 295 F. Supp. 2d at 192-94. The court specifically rejected the SEC's contentions that, in declining to stipulate earlier, it had both reasonable grounds to believe it might prevail on the matter and that the admission sought by Happ was of no substantial importance. See Fed. R. Civ. P. 37(c)(2)(B) and (C), infra. While the SEC now contends on appeal that the court was wrong on both counts and should have awarded no sanction, the SEC does not now question the actual amount of the sanction, which was based on Happ's attorneys' evidence of additional counsel fees and costs related to preparations to prove that the call in question was not made from Hanley's office.

Fed. R. Civ. P. 37(c)(2) provides:

> If a party fails to admit . . . the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves . . . the truth of the matter, the requesting party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees.

The rule requires an award of expenses unless the court finds that:

> (A) the request was held objectionable pursuant to Rule 36(a), or (B) the admission sought was of no substantial importance, or (C) the party failing to admit had reasonable ground to believe that the party might prevail

on the matter, or (D) there was other good reason for the
failure to admit.

Fed. R. Civ. P. 37(c)(2). We review for abuse of discretion an
award of Rule 37(c) sanctions. Marchand v. Mercy Med. Ctr., 22
F.3d 933, 936 (9th Cir. 1994). We will not reverse a Rule 37(c)
award of sanctions "unless we have a definite and firm conviction
that the district court committed a clear error of judgment." Id.

In contending that the district court abused its
discretion in awarding sanctions, the SEC argues that Hanley's
testimony gave it "reasonable ground to believe [it] might prevail
on the matter." Fed. R. Civ. P. 37(c)(2)(C). "[T]he true test
under Rule 37(c) is not whether a party prevailed at trial but
whether he acted reasonably in believing that he might prevail."
Fed. R. Civ. P. 37 Advisory Committee Notes, 1970 Amendment. Here,
the SEC eventually stipulated that the call did not take place from
Hanley's office on the 25th or on earlier dates but argues that
prior to that time it entertained reasonable doubts on the outcome
of the issue.

Whether the district court's ruling was the "right" one
is perhaps a close question, but we are not called on to engage in
de novo review but only to say whether the court abused its
discretion. See Marchand, 22 F.3d at 936. Favoring the court's
ruling is the fact that Hanley's deposition testimony prior to
trial concerning the June 25 voicemail was somewhat equivocal. He
testified in his deposition merely that he "believe[d]" he called

-41-

Happ from his office on June 25.  Later at trial, he testified only that his "best memory" was that he called Happ from his office on June 25.  He said he remembered making the call that day because he met with Reidel that day and because his office desk ledger for that date contains Happ's name and phone number (consistent with his habit of writing down a phone number and then calling the number).  The telephone company's records were, however, unequivocal in their failure to show a call from Hanley's office to Happ's phone number on June 25.  There was nothing whatever to suggest the telephone records were less than accurate or were incomplete.  By mid-trial the government tossed in the sponge.  The district court concluded that the government should have seen the handwriting on the wall sooner.  The court thought it unreasonable for the SEC to have believed that the jury would credit Hanley's equivocal testimony over the objective telephone records.  See Happ, 295 F. Supp. 2d at 193.

While, as noted, we find the point close, we cannot say the district court abused its discretion in rejecting the SEC's argument that Hanley's testimony provided it with reasonable grounds until well into the trial to believe it might prevail on the matter.  The SEC eventually stipulated that the call was not made from Hanley's office.  It could have done so at some point earlier, saving time and money for its opponent and enabling both parties to focus on the many real disputes in the case.  See

Marchand, 22 F.3d at 937 (affirming sanctions where misleading answers to requests for admission "significantly affected the cost of [plaintiff's] prosecution and contravened the goal of full discovery"). Moreover, the stipulation Happ had requested and that was eventually granted was a narrow one -- that a call had not been made to Happ from Hanley's office, not whether Hanley might have called Happ on June 25 or on the earlier dates from somewhere else.

The SEC also argues that sanctions were inappropriate because the admission sought was not of "substantial importance." An issue is of substantial importance when it is material to the disposition of the case. See, e.g., Wash. State Dep't of Transp. v. Wash. Natural Gas Co., Pacificorp, 59 F.3d 793, 806 (9th Cir. 1995) (holding that request that plaintiff admit that pollutants posed an immediate risk was of no substantial importance because plaintiff was not required to make such a showing). We think the district court was entitled to believe that it would be of substantial importance for Happ to be able to show that the call was not made on that date from Galileo's office as Hanley himself testified. Such a showing could cast doubt on whether the call was made at all, and it could possibly have affected the jury's view of the credibility of the SEC's key witness, Hanley.

We conclude the district court did not abuse its discretion in ordering the SEC to pay Happ the costs incurred in preparing to prove this fact at trial.

## IV. Conclusion

For the foregoing reasons, (i) the denial of the motion for judgment as a matter of law, or in the alternative, for a new trial, is <u>affirmed</u>; (ii) the calculation of the disgorgement amount and the imposition of the additional civil penalty upon Happ is <u>affirmed</u>; and (iii) the award of sanctions against the SEC is <u>affirmed</u>.